## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
#### Richmond Division

**BARBARA SCHMIDT**                        :
**122 Royal Worlington**
**Williamsburg, VA 23188**                  :

     **Plaintiff,**                     :

   **v.**                                 :   **Civil Action No. _____**

**BOAR'S HEAD PROVISIONS CO., INC.**        :
**1819 Main Street**
**Suite 800**                               :
**Sarasota, FL 34236**

                                                :

<u>**SERVE:**</u>  **Corporation Service Company**
         **Registered Agent**                :
         **100 Shockoe Slip, Floor 2**
         **Richmond, VA 23219-4100**          :

     **Defendant.**                      :

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Barbara Schmidt, by and through undersigned counsel, and respectfully move for judgment against Defendant on the grounds and in the amount set forth below:

### <u>JURISDICTION AND VENUE</u>

1.    The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1332(a), since the matter in controversy far exceeds, exclusive of interests and costs, the sum of Seventy-Five Thousand Dollars ($75,000.00) and there is diversity of citizenship between Plaintiff and Defendant.

2.    Venue is proper in this judicial district as the facts giving rise to Plaintiff's Complaint arose in this judicial district.

**PARTIES**

3.      Plaintiff is an adult resident of the Commonwealth of Virginia.

4.      Defendant Boar's Head Provisions Co., Inc. (Boar's Head) is a Florida corporation with its principal place of business located in Sarasota, Florida.  Defendant is, therefore, a citizen of the State of Florida. Defendant, however, is licensed to do business, and conducts business, in the Commonwealth of Virginia.

5.      At all times relevant to this action, Defendant was engaged in the manufacture, distribution, and sale of a variety of food products to customers across the country, including deli meat.

6.      At all times relevant to this action, defendant owned, operated and managed a Boar's Head plant in Jarratt, which is in Greensville County, Virginia.

**FACTS**

7.       Plaintiffs repeat and reallege the prior allegations as if set forth herein.

8.      This is an action against Defendant for injuries arising from the manufacture, distribution, and sale of contaminated food which was consumed by Plaintiff Barbara Schmidt and caused her serious injuries.

**The Boar's Head Listeria Outbreak**

9.      As of August 27, a total of 57 people infected with the outbreak strain of *Listeria* have been reported from 18 states – Including: Arizona 1, Florida 3, Georgia 2, Illinois 1, Indiana 1, Maryland 8, Massachusetts 3, Minnesota 1, Missouri 3, New Jersey 5, New Mexico 1, New York 17, North Carolina 1, Pennsylvania 2, South Carolina 2, Tennessee 1, Virginia 4, and Wisconsin 1.

10.     Sick people's samples were collected from May 29, 2024, to August 16, 2024.  Of 57 people with information available, all 57 have been hospitalized. One person got sick during their pregnancy and remained pregnant after recovering. So far, nine deaths have been reported, including one in Illinois, one in New Jersey, one in Virginia, one in Florida, one in Tennessee, one in New Mexico, one in New York, and two in South Carolina.

11.     Epidemiologic, laboratory, and traceback data show that Defendant's meats which are sliced at delis, including Boar's Head brand liverwurst, are contaminated with *Listeria* and are making people sick.

12.     Defendant's products sold at delis, especially those sliced or prepared at the delis, can be contaminated with *Listeria*. *Listeria* spreads easily among deli equipment, surfaces, hands, and food. Refrigeration does not kill *Listeria*, but reheating to a high enough temperature before eating will kill any germs that may be on these meats.

13.     Defendant published a recall of its deli meat products, including liverwurst other deli meats, on July 26, 2024. The United States Department of Agriculture's Food Safety and Inspection Service (FSIS) announced that Defendant expanded its <u>July 26, 2024, recall of deli meat products that may be adulterated with *Listeria monocytogenes*</u> on July 30, 2024. Defendant is recalling approximately 7 million additional pounds of ready-to-eat meat and poultry products. Whole genome sequencing results show that a sample of Defendant's liverwurst collected by the Maryland Department of Health tested positive for the outbreak strain of *Listeria monocytogenes*.

14.     This recall expansion includes 71 products produced between May 10, 2024, and July 29, 2024, under Defendant's Boar's Head and Old Country brand names. These items include meat intended for slicing at retail delis as well as some packaged meat and poultry products sold at retail

locations. These products have "sell by" dates ranging from 29-JUL-2024 through 17-OCT-24. View full product list. View labels.

15.     The products subject to recall were distributed to retail locations nationwide and some were exported to the Cayman Islands, Dominican Republic, Mexico, and Panama. The products shipped to retailers bear establishment number "EST. 12612" or "P-12612" inside the USDA mark of inspection on the product labels.

16.     The problem was discovered when FSIS was notified that a liverwurst sample collected by the Maryland Department of Health tested positive for *L. monocytogenes*. The Maryland Department of Health, in collaboration with the Baltimore City Health Department, collected an unopened liverwurst product from a retail store for testing as part of an outbreak investigation of *L. monocytogenes* infections. Further testing determined the product sample tested positive for the outbreak strain.

17.     Beyond issues like paperwork lapses and leftover meat on equipment, the inspection records show inspectors faulted Defendant several times for mold and mildew building up in many locations throughout the company's facility in Jarratt, Virginia. In July, federal inspectors found what looked to be mold and mildew around the hand washing sinks for the workers tasked with handling meats that are supposed to be ready to eat. Mold was also found building up outside of steel vats used by the plant, as well as in holding coolers between the site's smokehouses. "A black mold like substance was seen throughout the room at the wall/concrete junction. As well as some caulking around brick/metal," an inspector wrote in January, noting that some spots were "as large as a quarter."

18.     Other locations were found to have a number of issues with leaking and pooling water, including a puddle found with "a green algal growth" and condensation that was found to be "dripping over product being held."

19.     After inspectors flagged one of the leaks to the company, workers tried to mop up the leaks. "The employee wiped a third time, and the leaks returned within 10 seconds," inspectors wrote after one condensation issue was raised on July 27, 2024, near fans that looked to be blowing the liquid onto uncovered deli meats.

20.     In February, an inspector found "ample amounts of blood in puddles on the floor" and a "rancid smell" throughout a cooler used at the plant. A number of records also flag sightings of insects in and around deli meats at the plant, including one instance that prompted the agency to tag more than 980 pounds of ham in a smokehouse hallway to be "retained" or an investigation.

21.     In June, another report flagged concerns over flies going in and out of  "vats of pickle" left by Defendant in a room. "Small flying gnat like insects were observed crawling on the walls and flying around the room. The rooms walls had heavy meat buildup," the report notes. Other parts of the facility were also found to have bugs, including what looked to be "ants traveling down the wall," as well as a beetle and a cockroach.

**Listeria**

22.     *Listeria* is a gram-positive, rod-shaped bacterium that is ubiquitous and can grow under either anaerobic (without oxygen) or aerobic (with oxygen) conditions.

23.     Listeriosis is one of the most important bacterial infections worldwide that arises

mainly from the consumption of contaminated food.[1] The disease is caused by *Listeria monocytogenes*, which is considered an opportunistic pathogen that affects mainly those with underlying immune conditions, such as pregnant women, neonates, and elders, resulting in septicemia, meningitis, and/or meningoencephalitis. Of the six species of *Listeria*, only *L. monocytogenes* causes disease in humans. It thrives between bacteria 86-98.6ºF (30-37ºC), but *Listeria* can grow at temperatures as low as −0.4°C and survive in freezing conditions down to −18°C.[2] This unique quality allows thermal characteristics to be used as a means of differentiating *Listeria* from other possibly-contaminating bacteria.

24.     *Listeria monocytogenes* is omnipresent in nature; it is found widely in such places as water, soil, infected animals, human and animal feces, raw and treated sewage, leafy vegetables, effluent from poultry and meat processing facilities, decaying corn and soybeans, improperly fermented silage, and raw (unpasteurized) milk.[3]

25.     Foodborne listeriosis is relatively rare but is a serious disease with high fatality rates (20%–30%) compared with other foodborne microbial pathogens. Severe *L. monocytogenes* infections are responsible for high hospitalization rates (91%) among the most common foodborne pathogens, may cause sporadic cases or large outbreaks, and can persist in food-processing environments and multiply at refrigeration temperatures, making *L. monocytogenes* a significant

---

1        Reda, W. W., Abdel-Moein, K., Hegazi, A., Mohamed, Y., & Abdel-Razik, K. (2016). Listeria monocytogenes: An emerging food-borne pathogen and its public health implications. *The Journal of Infection in Developing Countries*, *10*(02), 149-154. https://doi.org/10.3855/jidc.6616

2        Santos, T., Viala, D., Chambon, C., Esbelin, J., & Hébraud, M. (2019, May 24). *Listeria monocytogenes Biofilm Adaptation to Different Temperatures Seen Through Shotgun Proteomics.* https://www.frontiersin.org/articles/10.3389/fnut.2019.00089/full.

3        Manning, A. (2019). Microbial Food Spoilage and Food Borne Diseases. In *Food microbiology and food processing* (pp. 125–130). Chapter 2. ED-TECH PRESS.

public health concern.[4]

26.     Ready-to-eat foods are a notable and consistent source of *Listeria*. For example, a research study done by the *Listeria* Study Group found that *L. monocytogenes* grew from at least one food specimen in the refrigerators of 64% of persons with a confirmed *Listeria* infection (79 of 123 patients), and in 11% of more than 2,000 food specimens collected in the study. Moreover, 33% of refrigerators (26 of 79) contained foods that grew the same strain with which the individual had been infected, a frequency much higher than would be expected by chance. The danger posed by the risk of *Listeria* in ready-to-eat meats prompted the USDA to declare the bacterium an adulterant in these kinds of meat products and, as a result, to adopt a zero-tolerance policy for the presence of this deadly pathogen. The Code of Federal Regulations includes requirements for the post-lethality control of *Listeria* in meat and poultry products. This regulation is referred to as "The *Listeria* Rule," which was enacted in 2003. The rule outlines prevention and control measures that must be taken in processing facilities to reduce the risk of contamination of ready-to-eat products.[5]

27.     *Listeria* typically spreads to people through contaminated food or water but can also be transmitted from mother to fetus.

28.     Except for the transmission of mother to fetus, human-to-human transmission of *Listeria* is not known to occur. Infection is caused almost exclusively by the ingestion of the bacteria, most often through the consumption of contaminated food. The most widely accepted estimate of foodborne transmission is 85-95% of all *Listeria* cases.

29.     The infective dose—that is, the number of bacteria that must be ingested to cause

---

4        Arslan, F., Meynet, E., Sunbul, M. *et al.* The clinical features, diagnosis, treatment, and prognosis of neuroinvasive listeriosis: a multinational study. *Eur J Clin Microbiol Infect Dis* 34, 1213–1221 (2015). https://doi.org/10.1007/s10096-015-2346-5

illness—is not known but is suspected to vary based on the strain. In an otherwise healthy person, an extremely large number of *Listeria* bacteria must be ingested to cause illness—estimated to be somewhere between 10-100 million viable bacteria (or colony forming units "CFU") in healthy individuals, and only 0.1-10 million CFU in people at high risk of infection. Even with such a dose, a healthy individual will suffer only a fever, diarrhea, and related gastrointestinal symptoms.

30.     The amount of time from infection to the onset of symptoms—typically referred to as the incubation period—can vary to a significant degree.[6]

31.     According to the CDC, symptoms of *Listeria* infection can develop at any time from the same day of exposure to 70 days after eating contaminated food. According to the FDA, gastroenteritis (or non-invasive illness) has an onset time of a few hours to 3 days, while invasive illness can have an onset varying from 3 days to 3 months. According to one authoritative text:

> The incubation period for invasive illness is not well established, but evidence from a few cases related to specific ingestions points to 11 to 70 days, with a mean of 31 days. In one report, two pregnant women whose only common exposure was attendance at a party developed *Listeria* bacteremia with the same uncommon enzyme type; incubation periods for illness were 19 and 23 days.

32.     Adults can get listeriosis by eating food contaminated with *Listeria*, but babies can be born with listeriosis if their mothers eat contaminated food during pregnancy. The mode of transmission of *Listeria* to the fetus is either transplacental via the maternal bloodstream or ascending from a colonized genital tract. Infections during pregnancy can cause premature delivery, miscarriage, stillbirth, or serious health problems for the newborn. Pregnant women make up around 30% of all infection cases while accounting for 60% of cases involving the 10- to 40-year age group.

---

5       USDA Staff. (2014, January 1). *Controlling Listeria monocytogenes in Post-lethality Exposed Ready-to-Eat Meat and Poultry Products*. https://www.fsis.usda.gov/wps/portal/fsis/topics/regulatory-compliance/guidelines/2014-0001.

33.     Several segments of the population are at increased risk and need to be informed so that proper precautions can be taken. The body's defense against *Listeria* is called "cell-mediated immunity" because the success of defending against infection depends on our cells (as opposed to our antibodies), especially lymphocytes, otherwise known as "T-cells." Therefore, individuals whose cell-mediated immunity is suppressed are more susceptible to the devastating effects of listeriosis, including HIV-infected individuals, who have been found to have *Listeria*-related mortality of 29%. The incidence of *Listeria* infection in HIV-positive individuals is higher than in the general population. One study found that:

34.     The estimated incidence of listeriosis among HIV-infected patients in metropolitan Atlanta was 52 cases per 100,000 patients per year, and among patients with AIDS it was 115 cases per 100,000 patients per year, rates 65-145 times higher than those among the general population. HIV-associated cases occurred in adults who were 29-62 years of age and in postnatal infants who were 2 and 6 months of age.

35.     Pregnant women naturally have a depressed cell-mediated immune system. While other systemic bacterial infections may result in adverse pregnancy outcomes at comparable frequencies, *L. monocytogenes* have notoriety because fetal complications largely occur in the absence of overt illness in the mother, delaying medical intervention. In addition, the immune systems of fetuses and newborns are very immature and are extremely susceptible to these types of infections.

36.     Other adults, especially transplant recipients and lymphoma patients, are given necessary therapies with the specific intent of depressing T-cells, and these individuals become

---

6       Goulet V, King LA, Vaillant V, de Valk H. What is the incubation period for listeriosis? *BMC Infect Dis*. 2013; 13:11. Published 2013 Jan 10. doi:10.1186/1471-2334-13-11

especially susceptible to *Listeria* as well. Other adults, especially transplant recipients and lymphoma patients, are given necessary therapies with the specific intent of depressing T-cells, and these individuals become especially susceptible to *Listeria* as well.

37. According to the FDA, CDC, and other public health organizations, individuals at increased risk for being infected and becoming seriously ill with *Listeria* include the following groups:

- Pregnant women: They are about 10-20 times more likely than other healthy adults to get listeriosis. About one-third of listeriosis cases happen during pregnancy. Fetuses are also highly susceptible to infection and severe complications.

- Newborns: Newborns can develop life-threatening diseases from perinatal and neonatal infections

- Persons with weakened immune systems

- Persons with cancer, diabetes, kidney, or gastrointestinal disease

- Persons with HIV/AIDS: Individuals with HIV/AIDS are almost 300 times more likely to get listeriosis than people with healthy immune systems.

- Persons who take glucocorticosteroid medications (such as cortisone)

- Persons of advanced age: One risk assessment showed people over 60 years old were 2.6 times more likely to develop listeriosis than the general population. And in 2011, the median age of diagnosed cases in people who were not pregnant was 71 years old.

38. Only a small percentage of persons who ingest *Listeria* fall ill or develop symptoms. For those who do develop symptoms because of their infection, the resulting illness is either mild or quite severe, in what is sometimes referred to as a "bimodal distribution of severity."[7] *Listeria* can cause two different types of disease syndromes with differing severity. Non-invasive *Listeria* infection causes gastroenteritis with symptoms such as diarrhea, nausea, and vomiting that resolve

---

7       Waldron, C. M. (2017, September 15). *The Recovery and Transfer of Aerosolized Listeria Innocua*. https://vtechworks.lib.vt.edu/handle/10919/78907.

on their own. Healthy adults without any immunocompromising conditions typically experience this milder version of the disease. The more severe type of disease caused by *Listeria monocytogenes* is called listeriosis and is referred to as an invasive illness.

39.     On the mild end of the spectrum, listeriosis usually consists of the sudden onset of fever, chills, severe headache, vomiting, and other influenza-type symptoms. Along these same lines, the CDC notes that infected individuals may develop fever, muscle aches, and sometimes gastrointestinal symptoms such as nausea or diarrhea. When present, the diarrhea usually lasts 1-4 days (with 42 hours being average), with 12 bowel movements per day at its worst.

40.     The more severe form of the illness occurs when the bacteria infect parts of the body that are typically sterile, such as the blood, brain, liver, and cerebral spinal fluid. The presence of the bacteria in these areas triggers the immune response and can lead to those more severe symptoms. *L. monocytogenes* has a specific affinity for the central nervous system (CNS), especially in cell-mediated immunodeficient individuals.[8]

41.     As already noted, when pregnant, women have a mildly impaired immune system that makes them susceptible to *Listeria* infection. If infected, the illness appears as acute fever, muscle pain, backache, and headache. The illness usually occurs in the third trimester, which is when immunity is at its lowest. Infection during pregnancy can lead to premature labor, miscarriage, infection of the newborn, or even stillbirth. Around twenty percent of such infections result in stillbirth or neonatal death.

42.     Newborns may present clinically with early-onset (less than 7 days) or late-onset

---

8     Arslan, F., Meynet, E., Sunbul, M., Sipahi, O. R., Kurtaran, B., Kaya, S., … Mert, A. (2015, June). *The clinical features, diagnosis, treatment, and prognosis of neuroinvasive listeriosis: a multinational study*. European journal of clinical microbiology & infectious diseases: official publication of the European Society of Clinical Microbiology. https://www.ncbi.nlm.nih.gov/pubmed/25698311.

forms of infection (7 or more days). Those with the early-onset form are often diagnosed in the first 24 hours of life with septicemia, meningitis, or respiratory distress and have a higher mortality rate. Early-onset listeriosis is most often acquired through trans-placental transmission. Late-onset neonatal listeriosis is less common and less severe than the early-onset form. Clinical symptoms may be subtle and include irritability, fever, poor feeding, and meningitis. The mode of acquisition of late onset listeriosis is poorly understood.

43.     For those persons who suffer a *Listeria* infection that does not resolve on its own, the complications can be numerous and possibly severe. The most common complication is septicemia (bacterial infection in the blood), with meningitis being the second most common. Other complications can include inflammation of the brain or brain stem (encephalitis), brain abscess, inflammation of the heart-membrane (endocarditis), septic arthritis, osteomyelitis (infection in the bone), and localized infection, either internally or of the skin.

44.     Death is the most severe consequence of listeriosis, and it is tragically common. The CDC has estimated that *L. monocytogenes* is the third leading cause of death from foodborne illness, with approximately 260 of 1,600 people diagnosed dying from their infections. For example, based on 2018 FoodNet surveillance data, 96% of 126 *Listeria* cases ended up in the hospital, the highest hospitalization rate for pathogenic bacterial infection. This data showed a fatality rate of 21%. According to the FDA, the case-fatality rate increases substantially based on complications, possibly reaching rates of 70% in cases with listeria meningitis, 50% in septicemia cases, and over 80% for perinatal/neonatal infections. In one US study, *L. monocytogenes* was reportedly the cause of nearly 4% of all cases of bacterial meningitis.

**The Plaintiff's *Listeria* Infection and Illness**

45.     At all relevant times, Plaintiff Barbara Schmidt regularly consumed Defendant's Liverwurst she purchased at Harris Teeter Lightfoot Market in Williamsburg, Virginia, on July 12, 2024.

46.     Plaintiff began to feel ill with vomiting, fever, fatigue, headache, chills, and confusion, beginning on July 13, 2024.

47.     She was seen in the Emergency Room at Williamsburg Regional Medical Center. Given her condition, plaintiff was admitted from July 16 to July 19, 2024.

48.     Plaintiff was released home but returned to the hospital on July 20, 2024, because of her deteriorating condition and her temperature, which rose to 104.  She was hospitalized again through July 29, 2024.  During this stay, Plaintiff spent at least six days in ICU undergoing invasive procedures that were necessary to save her life.

49.     Plaintiff was released again to rehabilitation on July 29, 2024, where she slowly recovered and was discharged home on August 8, 2024.  However, she was released home with antibiotic infusions to combat the *Listeria* infection.  She continues to recover.

50.     Plaintiff's *Listeria* infection has been determined by spinal tap by public health officials to be considered a case in Defendant's *Listeria* outbreak.

51.     Plaintiff's injuries were caused by Defendant's tainted food.

52.     As a further direct result of being sickened by Defendant's defective food product, Plaintiff has incurred, and will continue to incur, substantial medical bills and expenses associated with the treatment of her injuries; has suffered, and will continue to suffer, lost wages and wage-earning capacity; and has suffered, and will continue to suffer, significant pain, emotional anguish,

and other damages.

## COUNT I
### (Negligence/Gross Negligence/Recklessness/Failure to Warn)

53.      Plaintiff repeats and realleges the prior allegations as fully set forth herein.

54.      At all relevant times, Defendant was engaged in the business of manufacturing, distributing, supplying and introducing into the stream of commerce food products intended for human consumption.

55.      Defendant had a duty to Plaintiff and others avoid manufacturing, distributing, supplying, and introducing into the stream of commerce contaminated food, including liverwurst. Defendant breached this duty.

56.      Defendant owed a duty to the Plaintiff and others to use supplies and raw materials that complied with federal, state, and local food laws, ordinances, and regulations, including without limitation the statutes in Code of Virginia Title 3.2, Subtitle IV, Chapter 51, Articles 1-3; that were safe and reliable sources; that were clean, wholesome, and free from adulteration; and that were safe for human consumption and for their intended purposes.  Defendants breached this duty.

57.      Defendant owed a duty to the Plaintiff and others to use reasonable care in the selection, supervision, and monitoring of their employees, suppliers, or other subcontractors. Defendant breached this duty.

58.      Defendants owed a duty to Plaintiff and others to use reasonable care in the handling, manufacture, storage, and distribution of their meat products, to keep them free of contamination with *Listeria*.  Defendant breached this duty.

59.      Furthermore, at all relevant times, Defendant had actual and constructive knowledge that its food was contaminated and that consuming it would be extremely dangerous to consumers.

60.     At all relevant times, Defendant knew or had reason to know that the presence of *Listeria* bacteria in the food was not obvious to or readily discoverable by Plaintiff.

61.     At all relevant times, Defendant had a duty to warn Plaintiff and others that its food was contaminated, or likely contaminated, with *Listeria*. Defendant breached this duty in that Defendant did not warn Plaintiff that its food was contaminated, or likely contaminated, with *Listeria*.

62.     The food that Defendant manufactured, sold, distributed, and supplied was unmerchantable as to Plaintiff, and Defendant knew that at the time it sold, distributed, and supplied the product for Plaintiff's consumption that it was unmerchantable, but failed to warn Plaintiff and others of this fact.

63.     Defendant's actions as described herein were grossly negligent, reckless, and constituted utter and wanton disregard for Plaintiff's rights and safety.

64.     As a result of Defendant's negligent, gross negligent, reckless, and willful breaches of duties and noncompliance with applicable law and safety regulations, it manufactured, distributed, and sold food products that were not reasonably safe, and, as a proximate result, it caused Plaintiff to suffer severe personal injuries, as well as economic loss; caused her to suffer bodily pain and mental anguish; caused her to suffer past and future pain of body and mind; caused her to incur past and future medical and related expenses; and has caused here to suffer other past and future damages.

## COUNT II
### (Breach of Express Warranty)

65.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

66.     Defendant is a manufacturer, distributor, supplier, and seller of deli-meat food products and the components thereof. Defendant, through its manufacture, distribution, supply, and

sale of deli-meat food products, expressly warranted that its products were reasonably safe for their ordinary and foreseeable purpose (*i.e.*, consumption).

67.    Defendant was the manufacturer, distributor, supplier, and seller of the deli-meat food product consumed by Plaintiff that caused Plaintiff's exposure to *Listeria* infection.

68.    Defendant did not disclaim the warranties.

69.    To the contrary, Defendant marketed its deli-meat products, expressly promising that they were healthy and safe for consumption.

70.    Plaintiff is a consumer.

71.    The deli-meat products manufactured, supplied, and sold by Defendant were contaminated with *Listeria,* a potentially fatal pathogen.  As such, the deli-meat food products were unreasonably dangerous for their ordinary and foreseeable use.

72.    The deli-meat food products were contaminated with *Listeria* when they left the possession and control of Defendant and were subsequently consumed by Plaintiff.

73.    Defendant breached the warranty of the safety of its goods for their expected and foreseeable purpose.  This breach was the direct and proximate cause of Plaintiff's personal, economic, and other injuries, and Defendant is therefore liable to Plaintiff for the injuries Defendant caused.

<u>**COUNT III**</u>
**(Breach of Implied Warranty of Merchantability,**
**Fitness For a Particular Purpose, and Wholesomeness)**

74.    Plaintiff repeats and realleges the prior allegations as fully set forth herein.

75.    Under Virginia Code § 8.2-315, where a seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the

seller's skill or judgment to furnish suitable goods, there is an implied warranty that the foods shall be merchantable, fit for such purpose, and wholesome.

76.     At the time of sale, a merchant of food for human consumption impliedly warrants that the food is merchantable, fit for a particular purpose (consumption), and wholesome.

77.     Defendant was a merchant of food products.

78.     The food that Defendant manufactured, distributed, supplied, and sold was not merchantable, fit for Plaintiff's consumption, or wholesome because it was contaminated by *Listeria*.

79.     In Manufacturing, distributing, supplying, and selling the contaminated food, Defendant breached the implied warranties as described above.

80.     As a direct and proximate result of the breach of implied warranties by Defendant, Plaintiff was caused to suffer serious injuries, has suffered bodily pain and mental distress, has suffered and will suffer in the future pain of body and mind, has incurred medical and related expenses, and has suffered and will suffer in the future other damages.

## <u>COUNT IV</u>
### (Breach of Implied Warranty of Merchantability)

81.     Plaintiff repeats and realleges the prior allegations as fully set forth herein.

82.     Under Virginia Code § 8.2-314, a merchant that sells goods impliedly warrants that the goods are merchantable; *i.e.*, that the goods will pass without objection in the trade under the contract description; that the goods are fit for the ordinary purposes for which such goods are used; and, that the goods are adequately contained, packaged, and labeled as the agreement requires.

83.     The food that Defendant manufactured, distributed, supplied, and sold was objectionable because it contained *Listeria*.

84.     In manufacturing, distributing, supplying, and selling the contaminated food, Defendant

breached the implied warranties as described above.

85.     As a direct and proximate result of the breach of implied warranties by Defendant, Plaintiff was caused to suffer serious injuries; has suffered bodily pain and mental anguish; has suffered, and will suffer, in the future pain of body and mind; has incurred, and will continue to incur, medical and related expenses; and has suffered, and will suffer, other damages.

## COUNT V
### (Negligence *Per Se*)

86.     Plaintiff repeats and realleges the prior allegations as fully set forth herein.

87.     At all relevant times, the food that Defendant manufactured, distributed, supplied, and sold was adulterated with *Listeria* and was poisonous to Plaintiff.

88.     Virginia Code § 3.2-5126 prohibits the manufacture, sale, delivery, and offering or sale of adulterated food.

89.     Virginia Code § 3.2-5126 prohibits the dissemination of any false advertisement in connection with food.

90.     Virginia Code § 3.2-5126 prohibits the giving of a guaranty or undertaking concerning a food, which guaranty or undertaking is false.

91.     Plaintiff is a member of the class of people for whose protection Virginia Code § 3.2-5126 and Title 3.2, Chapter 31, Article 3 of the Virginia Code were enacted.

92.     The aforesaid violations of Virginia Code § 3.2-5126 constitute negligence *per se.*

93.     As a direct and proximate result of the aforesaid violations, acts of and/or omissions, Plaintiff was caused to be grievously injured.

94.     As a direct and proximate result of Defendant's negligence *per se* as described herein, Plaintiff was caused to suffer serious injuries; has suffered bodily pain and mental anguish; has suffered,

and will suffer in the future, pain of body and mind; has incurred, and will continue to incur, medical and related expenses; and has suffered, and will suffer in the future, other damages.

**COUNT VI**
**(Virginia Consumer Protection Act)**

95.      Plaintiff repeats and realleges the prior allegations as fully set forth herein.

96.      At all relevant times, Defendant was a supplier of goods under the Virginia Consumer Protection Act, Virginia Code § 59.1-196, *et seq*.

97.      Defendant marketed its deli-meat product, including the liverwurst consumed by Plaintiff, as safe for consumption and, as the company's slogan states, made with "Ingredients of Trust."

98.      At all relevant times, Defendant was engaged in a consumer transaction with Plaintiff, and Defendant intended Plaintiff to rely on its representations.

99.      The Virginia Consumer Protection Act prohibits a supplier that is engaged in a consumer transaction from misrepresenting that its goods and services have certain characteristics, ingredients, uses, or benefits; mispresenting that its goods and services are of a particular standard or quality; and, using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

100.      The deli-meat consumed by Plaintiff was not safe, nor was it made with "Ingredients of Trust," as they were contaminated with *Listeria*.

101.      The Defendant's false and misleading representations to the public concerning its *Listeria*-contaminated products, along with its other breaches as described herein, breached and constituted prohibited practices under the Virginia Consumer Protection Act (VCPA), Virginia Code § 59.1-200.

102.    Plaintiff relied on the defendant's false and misleading representations to the public concerning their *Listeria*-contaminated products.

103.    The defendant's breaches of the VCPA were willful and caused Plaintiff's injuries.

104.    Virginia Code § 59.1-204 permits consumers who are injured by a defendant supplier's willful violation of the Virginia Consumer Protection Act to recover actual damages, and treble damages if the defendant's violation was willful, as well as attorneys' fees and court costs. Accordingly, Plaintiff seeks damages, including treble damages, as well as costs and attorneys' fees under the VCPA against the Defendant.

105.    As a direct and proximate result of Defendant's violations of the VCPA, Plaintiff was caused to suffer serious injuries; has suffered bodily pain and mental anguish; has suffered, and will suffer in the future, pain of body and mind; has incurred, and will continue to incur, medical and related expenses; and has suffered, and will suffer in the future, other damages.

## COUNT VII
### (Fraudulent Concealment)

106.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

107.    With knowledge of the contamination of its food products with *Listeria* and other contaminants, and even though time is of the essence to avoid infection with *Listeria* when a person is exposed to it, Defendant intentionally concealed and suppressed material facts concerning the adulteration of the food products it manufactured, distributed, supplied, and sold to their customers. Defendant knew its food was adulterated and nonetheless failed to timely disclose this information to the detriment of Plaintiff and others, who Defendant caused to be infected with *Listeria*. Plaintiff relied upon Defendant's claim that it responsibly sourced its food and stood behind its slogan,

"Ingredients of Trust."

108.    Defendant knew for a protracted period of time that its deli-meat products were contaminated but failed to disclose to the public during that time the fact that the food was adulterated until after many people, including Plaintiff, became severely injured. By putting profits over people's health, Defendant failed to provide the public with the information it deserved and was entitled to know in order to avoid consuming the Defendant's contaminated product.

109.    Defendant had a duty to immediately disclose that its food products were contaminated given the conditions at the Jarratt plant to allow Plaintiff and others to avoid consuming the defective products. Defendant breached that duty, proximately causing Plaintiff's injuries and damages.

110.    Defendant had exclusive knowledge of the scope and extent of the contamination of its food products at its Jarratt plant but chose to continue to manufacture, distribute, supply, and sell its adulterated food products and not warn Plaintiff or other members of the public of the threat of illness from the consumption of its contaminated products.

111.    As a direct result of Defendant's concealment and suppression of material facts, Plaintiff has sustained damages as outlined herein, including without limitation being exposed to *Listeria* and contracting Listeriosis from Defendant's products.

112.    As a further direct and proximate result of Defendant's fraudulent concealment and suppression of material facts, Plaintiff was caused to suffer serious injuries; has suffered bodily pain and mental anguish; has suffered, and will suffer in the future, pain of body and mind; has incurred, and will continue to incur, medical and related expenses; and has suffered, and will suffer in the future, other damages.

WHEREFORE, Plaintiff demands judgment against Defendant in the sum of ONE MILLION DOLLARS ($1,000,000.00) for compensatory damages, plus interest from the date of injury and costs; punitive damages in the amount of Ten Million Dollars ($10,000,000.00); and an award of attorneys'-fees as may be permitted by law.

**TRIAL BY JURY IS DEMANDED BY PLAINTIFF.**

BARBARA SCHMIDT

By Counsel

Respectfully submitted,

REGAN ZAMBRI LONG PLLC


By:   */s/ Emily Lagan*_____
        Emily Lagan              VSB #93614
        elagan@reganfirm.com
        Salvatore J. Zambri  (*pro hac vice* to be filed)
        szambri@reganfirm.com
        1919 M Street, NW, Suite 600
        Washington, DC 20036
        PH:   (202) 463-3030
        Fx:   (202) 463-0667
        *Co-Counsel for Plaintiff*

and

MARLER CLARK, L.L.P, P.S.

        William D. Marler  (*pro hac vice* to be filed)
        bmarler@marlerclark.com
        180 Olympic Drive SE
        Bainbridge Island, WA 98110
        PH:   (206) 346-1888
        Fx:   (206) 346-1898
        *Co-Counsel for Plaintiff*